Nelson, J.,
delivered the opinion of the Court.
From the evidence in this cause, it appears the parties were the owners of adjoining farms, near the town of New Market, in Jefferson County; that in the month *46 of December, 1863, a force of rebel soldiers, under the command of General Vaughn, encamped for two or three days, and cut timber upon the land of defendant in-error; and that in January or February, 1864, a brigade of rebel soldiers, under the command of Gen. Longstreet, also encamped for about three weeks, and cut timber off said land; that the place of encampment was a convenient one, and had been used at different times by troops belonging to the Federal and rebel armies; that the land, consisting of about ten acres, was very valuable, on account of the timber growing upon it; that of this the- Federáis had destroyed about two, and the rebels six acres, leaving two acres standing. ■ It further appears, that, on the second occasion above mentioned, the rebels took some eight acres of standing corn, six or eight hogs, about two thousand pounds of hay, and about twenty dozen bundles of oats, and converted them to their own use.
This suit was brought, by original attachment, on the 14th of August, 1865. A declaration was filed in trespass, according to the form in use before the Code, and the plaintiff in error pleaded not guilty. The principal witnesses relied upon to connect him with the soldiers, and with the trespass, were Nancy Daily and Rufus Brazelton. The first of these witnesses stated that she saw Smith, the plaintiff in error, and some officers, riding along in front of her door, in New Market, going with rebel soldiers toward the camp-ground, in January or February, 1864; that the main army was ahead, and soldiers were in front and rear of him; that they went through Smith’s field and woods, and she saw fires that *47 night on Brazelton’s land, hut did not know whether Smith went with the soldiers into the timber. She stated further, that part of the soldiers had turned off toward the woods before Smith got to the turning-off place, and that most of the column were ahead of him, Margaret Daily states that she also saw him riding down street with some rebel officers, and saw the same number of men and horses, until they got into the timber; that she saw him make no signs as they were passing along, and that the soldiers were encamped “all around in the country.” Rufus Brazelton, son of the defendant in error, states that the tents of the officers were on Smith’s, and the main body of troops on Brazelton’s land; and that, in December, 1864, Smith was riding in advance of some troops, and pointed up in the direction of this timber, and some of them went up there, at which time about one-half of the remaining timber was cut. Witness stated, on cross examination, that he did not see Smith with the troops there in January, 1864, and that when he saw him pointing with his hands, in December, he heard him say nothing; that he also saw Smith point toward the hill belonging to Gen. Brazelton (not the plaintiff) and Baker, and that he did not know that Smith ever said one word to the soldiers, about taking any of his father’s property. On re-examination, witness said the soldiers camped, in December, on both sides of the road, in the direction Smith had pointed. It was also in proof that the soldiers, in going to their place of encampment, passed over Smith’s field and a part of his woodland, and that during the winter, some of his timber was cut, and his fences burned. William *48 Hammond, a witness for defendant, who owned adjoining land, testified that the Federal artillery first encamped upon the place in controversy, and on Smith’s land,, for about a week, and burned most of the fencing ; that it was then occupied by, what the witness denominates, “the one hundred days’ men, and next by Kirk’s command, both of the Federal forces; then by Gen. Vaughn’s command, of the rebel forces, and by Anderson’s brigade, of Longstreet’s army, also rebels; and that as many as three or four thousand men encamped there. It was further stated, by one witness, that the plaintiff, below, was a Union man, and defendant a rebel; which evidence was objected to by the defendant, but the objection was overruled by the Court, and exception taken by the defendant to the action of the Court. The charge of the Court to the jury, was not excepted to, and it is to be presumed that it was in all respects correct. Verdict and judgment were rendered in favor of defendant in error, for five hundred dollars and costs, and the case is before us upon appeal, in the nature of a writ of error, on the evidence alone, and upon the exception above stated, taken to evidence, and the objection made in the progress of the cause, to any evidence of different trespasses, from the trespasses first proven.
The declaration alleges, in the first count, that the defendant, “on the 1st day of January, 1864, and on divers other days and times, and before that day, between that day and the day of the commencement of the suit,” with force and arms, &c., felled, cut down and destroyed, one thousand oaks, one thousand pines, &c., of *49 the said plaintiff, &c. The second count alleges that, “on the 1st day of January, 1864, and divers other days, before and since that time, to the commencement of this suit,” the defendant, with force and arms, &c., took and carried away five thousand cords of wood, of great value, &c., five hundred bushels of corn, &c.- It is well settled that in actions, in form ea; delicto, several distinct trespasses may be joined in the same declaration in trespass: 1 Chit. Ph, 200, m. The time is not material; and when several trespasses are stated to have been committed, on divers days and times, between a particular day and the commencement of the action, the plaintiff is at liberty to prove a single act of trespass, anterior to the first day, though he can not give, in evidence, repeated acts of trespass, unless committed during the time stated in the declaration: 1 Chit. PL, 257; 2 Saund. on PL and Ev., 855, m. We are of opinion that the trespass is sufficiently laid with continuando, to let in the evidence as to several trespasses, and that there is no error in the action of the Court below, in refusing to limit the proof to the first trespass; but if this view were erroneous, the objection to the declaration, as framed, is so highly technical that it does not affect the merits, and can not, after verdict, prevail in this Court: See Code, §§ 2874, 4516.
While, in most cases, the political opinions of the parties are foreign to the issue joined, and inadmissible as evidence, we are not prepared to hold that, in a case like this, where the trespass was committed by soldiers, and the connection with it of the plaintiff in error, depended upon evidénce purely circumstantial, it was not *50 legitimate to prove the political relations of tbe parties, as part of the chain of circumstances, especially when those relations were proved by the personal knowledge of the witness, and not by vague rumors, in the nature of proof as to general character.* But, although we are of opinion that no error was committed in the court below, in the admission of testimony, we are thoroughly satisfied that his Honor, the Circuit Judge, ought to have granted a new trial, upon the evidence presented in this record. The proof that the plaintiff in error was a Rebel; that he rode with rebel officers and soldiers across his own land, to a place of encampment common to both armies; that he pointed in a direction which might indicate the land of the defendant in error, or of other adjoining proprietors; that timber was cut off the land of defendant in error, without cutting any from that of the plaintiff in error, and that the property of the former was taken, and that of the latter left, without one word of testimony to show that these acts were done by the advice, procurement, consent or connivance of the plaintiff in error — is so vague, indefinite and unsatisfactory, that we are constrained to hold there is no evidence to support the verdict.† The facts proved do not, in onr view, create the slightest preponderance of evidence against the [plaintiff in error, as they might well exist in perfect consistency, with the idea of his innocence. On the suppo *51 sition that the rebel soldiers knew that the plaintiff in error was of their political faith, and that the defendant was not, it was natural and in accordance with the general usage in the late war, that they should endeavor to do him as little injury 'as possible, and that if loss and inconvenience were to be sustained, they would cause these to fall upon the person with whom they differed, rather than upon one with whom they agreed — upon their enemy in preference to their friend. And had it been established by positive proof, instead of conjecture, that the plaintiff in error, discovering that the soldiers were determined to encamp upon his own land, or that of the defendant in error, and would take the timber or property of one or the other, informed them that he was a rebel, and the defendant in error was a Union man, and actually requested them to take the property of the latter and spare his own, we do not regard it as our duty to hold that he incurred the slightest civil responsibility. An old case, almost analogous in the criminal law, establishes a precedent from which such a conclusion may, without violence, be drawn; for, “where two persons being shipwrecked, have got on the same plank, but finding it not able to save them both, one thrusts the other from it, and he is drowned, this homicide is excusable, through unavoidable necessity, and upon the great universal principle of self-preservation, which prompts every man to save his own' life, in preference to that of another, when one of them must inevitably perish.” Broom’s Legal Maxims, 48; Law Lib., 6 m.; 4 Bla. Com., 186, m. But if the law of necessity, as applied to the saving of life, is inapplicable to the preservation of. property, we hold, upon the *52 facts of this case, and assuming that the jury were warranted in presuming that the timber was cut, and the other property taken, upon the suggestion or the advice of the plaintiff in error, that he can not be held as a trespasser, unless it appears, that the act done by the party counselled or advised, was unlawful — a trespass— and subjected him to civil liability. This defense may be relied upon under the plea of not guilty. It is not a technical justification, but a defense growing out of the testimony introduced by the plaintiff below. It is part of the transaction on which his action is founded, and he could not be surprised by the evidence. It falls within the rule laid down in 2 Greenl. Ev., § 94, that “if the act of the defendant was done by inevitable necessity, as, if it be caused by ungovernable brute force, his horse running away with him without his fault; or, if a lighted squib is thrown upon him, and to save himself he strikes it off in a new direction; in these and the like eases, the necessity may be shown, under the general issue, in disproof of the battery.” In Davis v. McNees, 8 Hum., 40, which was an action of slander, the defendant was permitted to show, under the pie of not guilty, that the words proved were spoken under such circumstances that they were not actionable; and, we hold in this case, that whether the plaintiff in error acted under inevitable necessity or otherwise, if the acts established by the proof against him were not unlawful, he may rely upon this defense, under the general issue. See, also, Gibbons v. Tarter, 5 Sneed, 644.
The question then recurs: Was the plaintiff in error a trespasser upon the facts proved in the case, and liable to a civil action? We answer it by declaring that *53 the act of taking and using wood, for fires for an army, under the circumstances of this case, is an act justified by the usages of war; that it grows out of an absolute necessity — a necessity that, so far as we know, was never doubted or questioned, as justifying the Federal army, under similar circumstances; and this presents the question as to whether, in the recent war, there was any difference in the rights of the two belligerents as to what acts each might perform, in the prosecution of the various operations of the war, in which they were engaged. The solution of this question depends upon various considerations; and, as there are other cases before us, in which similar questions are presented, we proceed to state our conclusions, and the process by which we have arrived at them, at greater length than would otherwise, seem to be demanded by the circumstances proved in this case. Aware that some conflict has existed, and still exists, in judicial opinions, as well as in the legal profession, in regard to various questions arising out of the war, and differing, as we do, to some extent, from the views promulgated by our immediate predecessors, it is alike respectful to others, and just to parties litigant, that the reasons for our conclusions should be presented with more than ordinary elaboration.
When the framers of the Constitution of the United States conferred upon Congress the power “to provide for calling forth the Militia to execute the laws of the Union, suppress insurrections, and repel invasions/’ and when Congress passed the Act of 1795, (chap. 36, 1 U. S. Stat. at Large, 424,) and the Act of 1807, (chap. 39, 2 Ibid., 443,) authorizing the President to call forth the Militia, and employ the land and naval forces, for the purpose of *54 executing the laws and suppressing insurrection, it can not be reasonably supposed that either the members of the Convention, or of Congress, had it in contemplation that any insurrection, or rebellion, would ever attain the gigantic proportions of the late civil war; and, consequently, no provision was made for the contingency of a civil war, in contradistinction to an insurrection, or rebellion, as defined by Vattel, and recognized by the Supreme Court of the United States, in the Prize cases, 2 Black, 667-8. In the absence of any constitutional provision, or congressional enactment, the courts, and the text writers, have resorted, to the law of nations, for the purpose of obtaining a solution of the difficult questions growing out of the war; and, in the case cited; which was determined while the war was pending; the contest was declared to be, not an insurrection or rebellion merely, bnt “the greatest civil war known in the history of the human race.” lb., 699. In that case it is said that, “Under the very peculiar construction of this government, the citizens owe supreme allegiance to the Federal Government; they owe, also, a qualified allegiance to the State in which they are domiciled. Their persons and property are subject to its laws. Hence, in organizing this rebellion they have acted as States, claiming to be sovereign over all persons and property within their respective limits, and asserting a right to absolve their citizens from their allegiance to the Federal Government. Several of these States have combined to form a new Confederacy, claiming to be acknowledged by the world as a sovereign State. Their right to do so is now being decided by wager of battle. The forts and territory of each of these States are held in hostility to *55 tbe General Government. It is no loose, unorganized insurrection, having no defined boundary or possession. It has a boundary marked by lines of bayonets, and which can be crossed only by force; south of this line is enemies’ territory, because it is claimed and held' in possession by a hostile and belligerent power.” — 2 Black, 673-4.
Vattel, whose work on the Law of Nations is of the highest authority, says that, “when a nation becomes divided into two parties, absolutely independent, and no longer acknowledging a common superior, the State is dissolved; and the war between the two parties stands on the same ground, in every respect, as a public war between two different nations. Whether a republic be split into two factions, each maintaining that it alone constitutes the body of the State, or a kingdom be divided between two competitors for the crown, the nation is severed into two parties who will mutually term each other rebels. Thus, there exists in the State two separate bodies who pretend to absolute independence,- and between whom there is no judge. They decide their quarrel by arms, as two different nations would do. The obligation to observe the common laws of Avar toward each other, is, therefore, absolute; indispensably binding on both parties, and the same which the law of nature imposes on all nations in transactions between State and State;” ‘Vat., Book III, chap. 28, pp. 426-427, § 295. •
It is thus shown that a civil war is, in its technical sense, a public war; and that, while it continues, the be-ligerents, so far as the laws of war are concerned, main *56 tain the same relation toward each other as independent •nations in a public or regular war. The same great author says there are certain rules adopted by the voluntary law of nations, which may be briefly stated as follows: 1. That regular war, as to its effects, is to be accounted just on both sides. 2. That the justice of the cause being reputed equal between two enemies, whatever is permitted to the one, in virtue of a state of war, is also permitted to the other; and 3, that this voluntary law of nations, which is admitted only through necessity, and with a view to avoid greater evils, does not, to him who takes up arms in an unjust cause, give any real right that is capable of justifying his conduct and acquitting his. conscience, but merely entitles him to the benefit of the external effect of the law and to impunity among mankind: Ibid, pp. 382-383, Book III, chap. 12, § 191. And in the same book, chap. 13, § 195, p. 385, it is repeated that “by the rules of the voluntary law of nations every regular war is, on both, sides, accounted just, as to its effects, and no one has a right to judge a nation respecting the unreasonableness of her claims, or what she thinks necessary for her own safety.”
It follows, therefore, that although municipal rights of sovereignty remained in the United States during the late civil war, .and could be reasserted whenever and wherever the Government was successful in arms, yet, while the war was pending, and wherever .the Government was unable to assert its authority, the belligerent rights of parties to the war, were precisely the same, and neither could, lawfully, assert any belligerent right superior to, or different from, the other. It is granted, in the Prize *57 cases, that these rights were mutually conceded in the late civil war; and so much of the opinion in Yost v. Stout, 4 Cold., 208, as assumes, or seems to assume, that belligerent rights were accorded, from motives of humanity and policy, and as a concession by the Government of the United States alone, is founded in error, or should be qualified by the statement that, soon after the commencement of the war, the United States recognized it as a civil war, in which belligerent rights existed under the law of nations. It is well known that, in- the commencement of the late civil war, the President of the United States was disposed to treat,, as traitors, all who were acting under authority of the Confederate . States. In the earlier stage of the war, the Government refused to agree upon a cartel for the exchange of prisoners, and it was declared, in Mr. Lincoln’s Proclamation, of 19th April, 1861, that any person who should molest a vessel of the United States, under the pretended authority of the Confederate States, should be held amenable to the laws of the United States for the prevention and. punishment of piracy, 12 U. S. Stat. at Large, 1258-1259. Under this proclamation, certain privateersmen, acting under commissions from the President of the Confederate States, who were captured by the United States, were taken into New York and Philadelphia, and indicted for piracy. Pour of them were convicted, in Philadelphia, but never sentenced; while, in New York, the jury could not agree. These arrests led to retaliatory action on the part .of the Confederate States, and in consequence of their threat to execute an equal, or greater number of prisoners, if the so-called pirates were punished, and also, in consequence *58 of remonstrances of tbe British Government, the Government of the United States, on the 31st January, 1862, virtually receded from its position. See Law. Wheat., 253, 2d Ed; Tenney’s Mil. andNav. Hist. lleb. 61. After various negotiations, a cartel, for the general exchange of prisoners, was finally agreed upon, on the 22d of July, 1862; and under its provisions, those who were at first treated as pirates, were exchanged. M. and N. Hist. B,., 323; 4 Law. Wheat., 593. The Confederate Government, on all occasions, negotiated with that of the United States, for the exchange of prisoners, on terms of perfect equality; and, in consequence of its ability to marshal large armies, the war, to all intents and purposes, was treated and carried on, by both belligerants, as a public war, in which each asserted and maintained, for the time being, the same belligerent rights. But we have been unable to find in any work to which we have' access, any clear, concise, certain and accurate definition of the nature and extent of belligerent rights, as understood by writers on international law, and can only deduce them from the usage of nations and their general exercise under the laws of war.
During the existence of the civil war between Spain and her colonies, and previous to the acknowledgment of the independence of the latter by the United States, the colonies were deemed, by them, belligerent nations, and entitled to all the sovereign rights of war, against their enemy. 3 Wheat., 610; 4 Ib., 52; 7 Ib., 337; Law. Wheat., 42-43. Among these sovereign rights of war, may be classed the right to attack and capture or destroy the persons and property of the enemy; to destroy his commerce; *59 to despoil and plunder liis territory; to levy contributions; and to put in practice, against him, every method known in civilized warfare, necessary to weaken him. — 1 Kent. Lect. "V-, 90-101, Mattel, book III, chap. 8, pp. 346-363.
Every nation, at war with another, is justifiable, by the general and strict law of nations, in seizing and confiscating all movable property of its enemy, of any kind or nature whatsoever, wherever found, whether within its territory or not; but the general usage now is, not to touch private property on land, without making compensation, unless in special cases, dictated by the necessary operations of war, or when captured in places captured by storm, and which repelled all the overtures for capitulation. — 4 Kent, 91-92 m; Ware, Adm’r, v. Hylton et. al.; 3 Dal. 199; 1 Pet. Cond. R., 104.
This usage was adopted in the earlier stage of the Mexican war, in the instructions to General Taylor, to abstain from appropriating private property to public use, until purchased at a fair price; but was departed from, and military contributions levied, before the close of the war. 1 Kent, 92, 93, m. in note. And it was notoriously departed from by the army of the United States, in every Southern State, during the late civil war, and the private property of the citizens, whether friendly or unfriendly to the government, was taken and appropriated to the uses of the army, in most cases, without any compensation; The departure from this usage on the part of the United States, would have justified the other belligerent — the Confederate States — in the adoption of a similar course, in regard to the private property of any of the citizens of the United States residing out of the limits of the Con *60 federacy, but would not Have justified taking, without just compensation, the private property of any citizen of the Confederate States, except in cases justified, as a military necessity, by the usages of war; because the Confederate States as a defacto government, were bound to protect their own citizens. Their right to follow the example of the United States, depended upon their equal rights as belligerents, and upon the law of retaliation. But, whatever may have been the actual practice of the two belligerents, there is no difficulty in ascertaining the laws of war as recognized by the United States. In the “ Instructions for the government of the armies of the United States in the field,” prepared by Francis Leiber, L.L. D., approved by the President, and published by order of the Secretary of War, April 24, 1863, General Orders, Volunteer Force, §2, ¶"37,-p. 70, it is declared that, “The United States acknowledge and protect, in hostile countries occupied by them, religion and morality, strictly private property, the persons of the inhabitants, especially those of women, and the sacredness of domestic relations. Offenses to the contrary shall be rigorously punished. This rule does not interfere with the right of the victorious invader, to tax the people,- or their property, to levy forced loans, to billet soldiers, or to appropriate property, especially houses, lands, boats or ships, and churches, for temporary and military uses.” In the same book, p. 68, ¶ 22, it is declared that, “The principle has been more and more acknowledged, that the unarmed citizen is to be spared in person, property and honor, as mueh as the exigencies of war will admit,” thus leaving a large margin to military necessity; and on p. 67, ¶17, it is said, “War is not carried *61 on by arms alone. It is lawful to starve the hostile belligerent, armed or unarmed, so that it leads to the speedier subjection of the enemy.” And in the further progress of the war, Major-General Halleck, Commander-in-Chief of the Armies of the United States, issued certain stringent instructions to the commanding officer in Tennessee, in which, among other things he said, “You have already been urged to procure your subsistence, forage, and means of transportation, so far as is possible, in the country occupied. This you had the right to do, without any instructions. As the Commanding-General in the field, you have the power to enforce all laws and usages of war, however rigid and severe these may he, unless there be some Act of Congress, regulation, order or instruction forbidding or res .rioting such enforcement.” Law. Wheat., 2d Ed., Supplement, p. 40. Such being the laws of war, as recognized and promulgated by the United States, we hold that, during the war, it was lawful for the armies of General Yaughn, and General Longstreet to encamp upon the lands of defendant in error; and to cut down and consume the timber therefrom; that said military commanders in active service, were the proper and only judges of the propriety or necessity of taking and consuming the other property mentioned in the pleadings, and that, if it was láwful in them to take, it was lawful for the plaintiff in error, who was then within their lines, and sympathized with their objects in the war, to advise the taking; and that, in this view, no trespass was, either in law or in fact, committed. How the law would be if it were shown that the party giving the advice was animated solely by malicious motives, or personal *62 hatred, or revenge; or liow it would be, if there had been any proof that plaintiff directed the seizure of the corn, hogs and hay, it is unnecessary for us to determine, as there is no proof in the record to require such determination.
The right of the United States, through the army, to take and appropriate private property, in the late civil war, was fully discussed and carefully considered in Taylor v. N. & C. R. R. Co., 6 Cold., 650, and it was held that even in friendly territory, the right exists under the general powers of the Government; and that the military commander is the proper judge of the necessity, and cannot be held responsible, in a civil tribunal; and, for the reasons already stated, we hold that, during the late civil war, the same principle was applicable to the armies of the Southern Confederacy. In the case just cited, the right of the Government to take and impress private property, for the use of an army in the field, and upon the actual theatre of military operations, was fully considered in the learned opinion of the Court. It was rested upon the police power of the nation, and declared to arise from its obligation to protect the national existence and the lives and property of its citizens; and, while the duty of the government to make compensation to those whose property has been taken and appropriated to public use, was distinctly recognized, it was held that this is not a condition precedent to the right to take property, or to the vesting of title thereto in the Government. — Ibid., 651.
The duty of making compensation to their own citizens was, at all times, fully recognized and enforced by the Government of the Confederate States of America, *63 and never departed from, so far as we are informed, except under the pressure of military necessity, and by armies engaged in actual hostilities. Citizens were paid for their property from the commencement of the war, and the right of impressment was regulated by statute. An Act was passed by the Congress of the Confederate States, approved March 26, 1863, entitled, “An Act to regulate impressments,” and this was amended by An Act approved April 27, 1863; and still further amended by An Act approved February 16, 1864. These Acts provided for the impressment of private property, and its fair valuation in cases where the impressing officer and the owners could not agree, and for payment to the owner. Regulations were prescribed, from time to time, by the War Department of the Confederate States, for carrying said statutes into effect; and so late as March 7, 1864, in the regulations issued by “S. Cooper, Adjutant and Inspector-General,” it was directed in § "VI. that “No officer or agent shall impress the necessary supplies which any person may have for the consumption of himself, his family, employes or slaves, or- to carry on his ordinary mechanical, manufacturing or agricultural employments.”
In the Constitution of the United States, Article V., it is provided that private property shall not be taken for public use without just compensation, and the same provision was contained in the Constitution of the Confederate States, Art. I., § 16.
It will thus be seen that both belligerents acknowledged in their fundamental law, the duty of making compensation; and this has always been considered as *64 in affirmance of a great doctrine, established by the common , law, laid down by jurists, as a principle of universal law, and founded on natural equity. Story Const., § 1790. But while the lawful Government ■ of the United States and the de fado Government of the Confederate States mutually acknowledged, at least in theory, the application of this principle • to their own citizens, the stern and rigorous doctrine recognized in the law of nations, that all movable property of their enemies, including private property, may be seized or destroyed, was practically adopted by both belligerents; and, as has been already announced, we hold that, in the late civil Avar, each party belligerent was entitled to the same belligerent rights. This doctrine, is fully recognized, not only in the authorities before cited, but in LaAvrence’s Wheaton, 521, 522, text, and 523 in the notes, and is incidentally stated in Halleck’s Int. Law, 458, 459, 464. It was declared, in another form, by the Supreme Court of the United States, long before our civil Avar, in the case of the Santissima Trinidad, and the St. Andre, 7 Wheaton, 283; 5 Peters’ Cond. R., 284. There it was held that, during the existence of the civil war between Spain and her colonies, and previous to the acknoAvledgement of the independence of the latter- by the United States, the colonies were deemed by us, belligerent nations, and entitled, so far as concerns us, to all the sovereign rights of war against their enemy. And, in two cases determined by the Court of Appeals of Kentucky, in 1866, the same general principle was asserted and enforced. In the one, it was held that the capture of horses for the public *65 use of the Confederate army, under military authority, express or implied, however wrongful in fact, was excusable as a lawful exei’cise of a belligerent right: Price v. Poynter, 1 Bush’s Ky. R., 387. In the other, it was announced that the admitted laws of all civilized, warfare entitle each party in a civil war, to the same right of capture or destruction of enemies’ property, and show that when either the capture or destruction of property by one of such belligerents is lawful, it is equally lawful by the other; and if unlawful by one; it would' be equally so by the other. Bell v. Louisville and Nashville R. R. Co., 1 Bush’s Ky. R., 404.
It was declared by this Court, in Hammond v. The State, 3 Cold., 236, that in the late civil war, the people -were separated into two distinct and hostile societies, each, as belligerents merely, standing on the same level, and entitled, pending the contest, to the same rights of war, as against each other, that they would have been entitled to, had they both been independent sovereigns; and that they could alike take prisoners, capture property belonging to each hostile party, and deal with combatants, for the time, wherever the armies marched, as two sovereign and independent States. Ve fully approve the principle as there stated. The doctrine seems to have been greatly modified in Yost v. Stout, 4 Cold; 205, where it was held that Yost and other Confederate soldiers, who had taken the wagon and mules of Stout, by order of the commander of the rebel force, were trespassers, and that the order was no justification. The ease of Yost v. Stout, and the eases of Davidson v. Manlove, 2 Cold., 346, and Wood v. Slone, 2 Cold., 370, *66 seem also to. be in conflict, with Hammond v. The State, and so far as they and similar cases in ColdwelFs Reports are opposed to the views presented in this opinion, are overruled, The case of Fottrell v. German, 5 Cold., 580, in which it was held that a note executed by a Confederate surgeon, for the rent of a hospital building, was not illegal and void, as being in aid of the rebellion, is approved, so far as it goes, .and it .might,, perhaps, be rested on firmer ground. The cases of Wright and Cantrell v. Overall, 2 Cold., 336, and other cases.in which it was held that the Confederate or rebel Government was. not a de facto Government, are overruled,, so far as th,ey are not in unison with this opinion. Tl\e ..doctrine that the rebels were insurgents, merely, and .that the Government of the Confederate States of America was not, a de facto government, involves, perhaps, the consequence that the United States might be liable to foreign Governments, and possibly, to their own citizens, for all their acts and liabilities, and we are not disposed to yield our assent to a doctrine fraught with consequences of such gravity and importance. Were it an original question, we would, without hesitation, declare that a government which assumed to form a Constitution, had a President and Cabinet in actual authority, a Congress that enacted laws, on most subjects of national legislation, and published them in due form and enforced them; which was recognized as a belligerent power, by two of the greatest nations on earth; was enabled to issue and keep afloat a currency; set on foot a navy that harrassed the commerce of the United States throughout the world; marshalled immense armies; *67 fought great battles, and kept the power of the United States at bay for four years, was, to all intents and purposes, a de faeto Government; and that it required no recognition on the part of the Government of the United States, to establish a fact well known to millions of people, and which will be transmitted to future ages, in every truthful history, that has been, or may be, written, of the war. But, for the present, we are satisfied to declare that Wright and Cantrell v. Overall, is in conflict with Thorington v. Smith, decided by the Supreme Court of the United States, and reported in 8 Wal., 1-15, where the Government of the Confederate States is expressly held, (pp. 9, 10,) to have been a de facto Government, or at least a government of paramount force. See Sherfy v. Argenbright, post.
Let the judgment of the Circuit Court, in this case, be reversed, and the cause remanded.

 See Ellis v. Spurgin, post p. 74; Hart v. Reynolds, post —; Swaggerty v. Caton, 16.

 See Parkey v. Yeary, post — ; Witt v. Haun, post — ; Lay v. Huddleston, post — ; Nance v. Haney, post — .